UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                      Case No.: 3:21-CR-13-HES-JBT

ADAM AVERY HONEYCUTT

_____

SENTENCING MEMORANDUM

The Defendant, **ADAM AVERY HONEYCUTT**, by and through the undersigned attorney, files this sentencing memorandum to support his request that the Court sentence him to a sentence of time-served, followed by supervised release.

> **"One moment can change a day, one day can change a life and**
>
> **one life can change the world." -Buddha**

So in one moment, Adam Honeycutt, watching the news and seeing the January 6th rally being described as a historic moment, decided to go to Washington.  He flew up the day before and took the bus back home from there.  Those three days have now changed his entire life and have impacted his family beyond measure, too.[1]  That one moment changed a day and many

---

[1] Mr. Honeycutt's letter to the Court is attached to this Sentencing Memo.

1

lives.

He became one of the more than 500 Americans charged with various crimes as a result of the day's activities.   Mr. Honeycutt's case remains pending on the criminal complaint, where he faces two misdemeanor charges. His next court date is set for the afternoon of October 4, 2021, for a status conference.

But because he became the subject of an investigation by the FBI, the agents obtained a search warrant for his home.   During the search for electronics, they found firearms and marijuana (paraphernalia).   Because Mr. Honeycutt did not want his fiancee to get into any kind of trouble, he immediately confessed to the drugs.   During this entire time, he has always been ready to accept responsibility for the charges.

Adam Honeycutt is more that the charges he pleaded guilty to before this court.[2] He is a family man and entrepreneur in his community and loved by many people given his heart for serving others. Ultimately his patriotic zeal and desire to support the former president led to some poor decision making while he was at the capitol in January of this year, which led to a search of his

---

2  There are numerous letters of support received from family, friends, neighbors, and others indicating their shock at learning of Mr. Honeycutt's arrest and attesting to his good character and helpfulness.

family's home and his arrest in the instant case. Mr. Honeycutt realized, after the fact, what a detriment his 3-day trip to the capitol has been to his family – including his fiancé, three minor children, and elderly father.

If he could take it all back, he would, but since he cannot, he is focused on becoming a better man because of it all. After all, that is the true story of Adam Honeycutt – a young man who became successful in life and business because of his integrity and reputation in his community.

## MR. HONEYCUTT'S HISTORY AND CHARACTERISTICS

Mr. Honeycutt did not have an easy start in life, which makes his success in life and business all the rarer as compared to so many other cases where poverty and trauma are underlying factors in repetitive criminal behavior. Contrastingly, Mr. Honeycutt has only miniscule interaction with law enforcement in his life. When he was two years old, his late mother (Lisa Jackson) had placed him and his brother in the foster system shortly after separating from their father and winning temporary custody of the boys. Though it is uncertain what his mother's reasons were for the foster care placement, some suspect she had issues with drug addiction. In any case, several months later, Jerry Honeycutt was contacted by social services asking him to step in to avoid his sons' permanent placement with an adoptive family.

3

Single parenthood was tough for him. At the time he took his sons back, he was working for a beer company and renting a room in his coworker's trailer in South Carolina. Affording daycare for the boys made for an even tighter family budget, but he managed somehow. Jerry decided to move back to North Carolina with the boys and rent a home from his sister and divorced the boys' mother. He described his son as a very outgoing child who needed a lot more attention than he was able to give him.

Mr. Honeycutt grew up in the poorest neighborhood in Charlotte, NC. He was picked on a lot by other children and had to learn to fight to defend himself from the neighborhood kids. He stated it was just a matter of "being the poor white kid at a majority black school." His father ran a janitorial business and drove truck to support him and his disabled older brother growing up, and his paternal Aunt Patricia kept an eye on them in his absence. They went to church regularly early on, and his father instilled the principles of hard work and honesty in him through his daily example.

At about age 10, Mr. Honeycutt and his brother came to the Punta Gorda area to be with their mother for a while. Jerry Honeycutt recalls his son saying to him one day, "I miss my Mommy," and responding with "she loves you," while agreeing to allow Mr. Honeycutt and his brother to visit her for the first

4

time in many years. Jerry Honeycutt did so knowing that his sons would come to understand who their mother was on their own without offering his opinion of her. Several weeks later, Mr. Honeycutt's brother was sent back to his father, while his mother decided she wanted to keep Mr. Honeycutt with her. It was a matter Jerry Honeycutt had to resolve through the courts to get his son back, and a situation where the court recognized that it was in the child Mr. Honeycutt's best interest to remain in the custody of his father. The whole ordeal was very disruptive in a way to everyone involved. Jerry Honeycutt figured that his son got an idea of what life with his mother was like in that experience.

Back in Charlotte, North Carolina, Mr. Honeycutt grew up fast. By age 13 he ran away from home for his first prolonged period and dropped out of school altogether not long after. In 1999, Mr. Honeycutt was 18 years old. He made the choice to start a new life over in Florida once again after witnessing a gang-related shootout at a trailer where he happened to be at the time of occurrence. There was talk that some of the gang members wanted to get rid of him as a witness, so he got out of town. After settling in Punta Gorda, Mr. Honeycutt reacquainted with his mother and got quick to work in construction and other odd jobs. He was content with whatever he could find and rented a

room in a trailer at first. He was well liked by the people with whom he came in contact. In fact, his personality and appearance earned him the nickname, "Bundy," for his resemblance of Bud Bundy from the 90s series, Married with Children. People contacted him to host weekend dance parties, where he charged an admission in exchange for providing music, lights, water, and event security. This was the start of his entrepreneurism. Not long after, Mr. Honeycutt met Beverly Blanding, who showed him the ropes of the bail bonding business. Mr. Honeycutt was a natural in the business. He knew how to talk to people and was a good negotiator.

In August 2008, Mr. Honeycutt started his own bail bond company. "I learned along the way," he said. As he did not yet know all the technicalities of running a business, particularly with bookkeeping and accounting. By the end of his first year in business, he owed $50,000 in insurance fees for his lack of understanding. But, undeterred by the challenge, Mr. Honeycutt set up a payment plan and got his business back on track after learning a tough lesson. He took his licensure seriously and learned from his mistakes. He is always wanting to become better at business. About a year later, he met the mother of his children, Samantha Corwin, through a mutual friend, and they began dating occasionally. For years they did not see one another much given that

6

Ms. Corwin was going to school full-time and working night shift as a bar tender, while Mr. Honeycutt worked his business 7 days a week.

Though they were both individually determined to succeed in their own lives, Mr. Honeycutt and Ms. Corwin were also attracted to this attribute in one another. Mr. Honeycutt has a good sense of humor and would take Ms. Corwin on beach dates when he could. In 2013, they welcomed their oldest daughter, with their second daughter arriving shortly thereafter in 2014. Around this time, Mr. Honeycutt's father, Jerry, came down to see if he liked the Florida life. He helped Mr. Honeycutt run a pawnshop that he had opened next door to his bail bonds company. It worked out well. Ms. Corwin said that Mr. Honeycutt was always trying to diversify his business options, and he also ran a landscaping company for a few years. Mr. Honeycutt, although he lived in the same town as his mother, they never became close.

As the girls neared school age, Ms. Corwin purchased a home in Orange Park to take advantage of the great public schools in the Oakleaf area. While it served the purpose of getting the girls in a good school, it was also a big sacrifice for the family as Mr. Honeycutt was constantly on the road to run his business back and forth between Jacksonville and Punta Gorda during the week. In the meantime, Ms. Corwin opened her own bail bond company in

7

Jacksonville, and gave birth to a son in 2019. The couple hope to open a retail business in the Jacksonville area in the near future and add employees to allow them more time to raise their children. Mr. Honeycutt longs to raise his children in a farm or rural setting and teach them practical lessons. He wants to learn to weld and use that skill to supplement the family businesses.

**SERIOUSNESS OF THE OFFENSE,
PROMOTE RESPECT FOR THE LAW, AND
PROVIDE JUST PUNISHMENT**

Federal sentencing law generally asks a court to consider retribution, deterrence, incapacitation, and rehabilitation. Retribution imposes punishment based on moral culpability, whereas deterrence, incapacitation, and rehabilitation are directed towards society's future security.

By the federal government prosecuting this case, it has shown the seriousness of federal firearms law.

Also, the offense here before this court is that Mr. Honeycutt possessed lawful firearms, inside his own home, at a time when he also smoked marijuana.  There is no allegation that he used the firearms for any bad purpose.  There is no allegation that he used the firearms in any way in connection to his personal use amounts of marijuana.  There is no allegation that he sold or distributed any marijuana.  The simple fact is that the

government has alleged and he has admitted that he possessed firearms and used marijuana.  Surely the combination of a felony conviction, a term of incarceration (even if only the time served in various county jails), and a term of supervised release demonstrates the seriousness of such an offense.

## DETERRENCE AND PROTECTING THE PUBLIC

It is hard to measure how, or even whether, any particular court case sends a message to the community.  But to the extent that this case does, it surely deters others when they see the combined consequences suffered by Mr. Honeycutt.

Additionally, the court will be able to supervise Mr. Honeycutt's future compliance with the court's terms by having Mr. Honeycutt supervised by a federal probation officer.

## KINDS OF SENTENCES AVAILABLE, THE SENTENCING GUIDELINES AND USSC POLICY STATEMENTS

The PSR calculates the guidelines and assigned a base offense level of 20 based on the 'large capacity magazine."   However, Mr. Honeycutt would argue that the fact of the size of the magazine is not necessarily a rational calculator for the sentencing range in this case.

Under the guidelines, a "semiautomatic firearm that is capable of

9

accepting a large capacity magazine" means a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm..."   USSG §2K2.1, comment. (n.2).

The Guidelines in §2K2.1 were amended to include the definition "semiautomatic firearm capable of accepting a large capacity magazine" in November 2006.   (*See* Amendment 691).   Prior to November 2006, the Guidelines provided an increase to the base offense level for possession of a firearm prohibited by 18 U.S.C. §921(a)(30), which was the semiautomatic assault weapon ban that expired on September 13, 2004.   Thus, the previous guidelines provided an increase to the offense level for possession of a firearm that was itself illegal.   This is similar to the current Guidelines increases for offenses described in 26 U.S.C. §5845(a) (that is, short barrel shotguns, machineguns, silencers, etc).   A specific offense characteristic which increases the offense level for a prohibited person possessing an illegal firearm seems like a logical calculation by the Commission.

However, the Guideline amendment in 2006 made possession of a lawful

firearm or magazine subject to the same increase. This increase makes less sense given that the magazines at issue in this case are not themselves illegal.

Further, in 2006, it was less likely that a firearm would have a 'large capacity magazine.'  In the past, if a firearm owner wanted to possess a 'large capacity magazine' he or she might be required to purchase a more expensive firearm or a special magazine.  However, many of the firearms marketed today have large capacity magazines.  Thus, it is less rare for this enhancement to apply and less likely to reflect the culpability of an offender.

Academy Sports is a federally licensed firearms dealer and sells firearms and ammunition, along with camping gear, clothes, fishing rods, at its area stores. This is an advertisement from Academy Sports store:



In the center of the second row of the advertisement, there are two

11

handguns offered for sale at $299.99.   The first, the Smith and Wesson, is available in two calibers:   9 millimeter and 40 caliber.[3]   In this Smith and Wesson model, an offender caught with the 9 millimeter version would be subject to the enhancement since the firearm is capable of holding 16 in the magazine and one in the chamber.   An offender caught with the 40 caliber firearm would not:   his gun can only accept 14 in the magazine and one in the chamber.[4]   At the same exact price point, a person caught with the Taurus 9 millimeter would not be subject to the enhancement, having a magazine with only twelve rounds.   The Ruger and the Springfield firearms on the bottom row would also warrant the enhancement.

This advertisement is meant to demonstrate the ready availability of lawful firearms which would warrant the increased base offense level.

The government may argue that this case is not a borderline case since Mr. Honeycutt had several large capacity magazines.   However, the same argument applies since the clips are lawful to purchase (unlike the semiautomatic assault weapons described in the original guidelines).

---

3  The caliber of a bullet is a measurement of the diameter of the slug (projectile) part of the bullet cartridge.   It particularly measures the bullet's diameter.   http://www.thefirearms.guide/ammo/what-is-caliber (last accessed December 28, 2016).
4  The definition of the 'large capacity magazine' only looks to whether the magazine or similar device could accept more than 15 rounds.   It does not seem to care if one is in the chamber.

## NEEDED EDUCATIONAL OR VOCATIONAL TRAINING

This directive to the court is difficult to address since it conflicts with the directives given to the Sentencing Commission in 28 U.S.C. §994(k), which at "reflect the general *inappropriateness* of imposing a sentencing to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment."  (Emphasis added).

Given Mr. Honeycutt's work history and his likelihood of obtaining employment quickly after the end of his sentence, it does not appear that he would benefit from incarcerative programming.  Further, given the ongoing COVID19 issues, there are some programs that are not available at the BOP.

## CONCLUSION

In reflection of the meaning of his arrest and current detention, Mr. Honeycutt stated that the reason for it all was to "slow me down" enough so that he could truly understand what is important to him in his life, and to finally "read the bible." Jerry Honeycutt is proud of the man his son has become despite the setback of his poor decision making. Mr. Honeycutt has always been a "go-getter" according to his father.  The fact that he grew up "so poor that the people on welfare laughed at him" made his drive to succeed all the

greater. One of the main principles Mr. Honeycutt learned from his early years in church was to serve others, his father said, "it always stuck with him." And as the outpouring of support in the letters from family suggests, Mr. Honeycutt is absolutely a man who serves his community in any way he can.

In hindsight, Mr. Honeycutt is regretful of his decision to attend the January 6 rally at the capitol earlier in the year. Of course, had he put his guns in storage as he had planned, perhaps this whole mess wouldn't have happened. He never wanted for the ATF agents to storm his house and disrupt his family's life. Samantha Corwin remains traumatized by the event, where agents with machine guns entered the home and cordoned her and the children off in a corner of the home as they searched. She realized the effect it was having on her children when her oldest child asked her if her father was "dead." She never expected her husband's patriotism would lead to the raiding of their family home. It was a total shock to her, yet she remains committed to him and supports him in getting through this. Mr. Honeycutt is determined to put this experience behind him and become a stronger man for his family. He prays that the court will consider the totality of his life when fashioning a sentence of the least restrictive nature possible to satisfy the purposes of sentencing.

Defense suggests that a sentence of supervised release on home

confinement will serve as a deterrent for others in the community and uphold the ends of justice. Mr. Honeycutt has been in custody continuously since February 24, 2021 and has had the additional hardship of prolonged transports from McClenny to Washington, DC in during the pandemic. While in transit, Mr. Honeycutt was assaulted by another inmate while using the phone at the Grady County Jail in Oklahoma.   The inmate struck him on the back of the head causing Mr. Honeycutt to hit his head on the ground and suffer dizziness and a black eye. While he suspected he may have had a concussion, this has never been confirmed medically. Also, while detained at the Baker County Jail, Mr. Honeycutt tested positive for Covid-19 and was placed on restrictive quarantine for 14 days while he recovered.   Arguably, the time that Mr. Honeycutt has served since his arrest – 231 days at the time of sentencing – has been some of the longest, hardest days of his life. A sentence of supervised

release with a period on home confinement will create a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing in Mr. Honeycutt's case.

Dated:   October 4, 2021.

A. Fitzgerald Hall, Esq.
Federal Defender – Middle
    District of Florida

*s/ Lisa Call, Esquire*
Lisa Call, Esquire
Fla Bar Number 0896144
200 West Forsyth Street
Suite 1240
Jacksonville FL 32202
Telephone: 904-232-3039
Facsimile: 904-232-1937
Lisa_call@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by electronic filing through the United States District Court to Kelly Karase, US Attorney's Office, 300 North Hogan Street, 7th Floor, Jacksonville, FL 32202 on 1st of September, 2021.

*s/ Lisa Call, Esquire*
Lisa Call, Esquire
Assistant Federal Defender

16